UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

JESSICA VIDAL,                                              **COMPLAINT**

                                                           **26 cv 4726**

                                                           **ECF Case**

                          Plaintiff,

              vs.

The CITY OF NEW YORK, JOHN DOES,              **JURY TRIAL DEMANDED**
in their individual and official capacities,

                          Defendants.
------------------------------------------------------------x

Plaintiff Jessica Vidal, by her attorney, Cyrus Joubin, complaining of the Defendants,

respectfully alleges as follows:

## PRELIMINARY STATEMENT

1.  This action arises from civil rights violations against Jessica Vidal ("Plaintiff" or

"Vidal") by New York City police officers.  Plaintiff asserts constitutional claims

pursuant to 42 U.S.C. § 1983 ("Section 1983") against the individual defendants for

violation of substantive due process and failure to intervene, and a *Monell* claim against

the City of New York for the same constitutional violations.  Additionally, Plaintiff

asserts analogous claims under New York City Law against the individual defendants,

and against the City of New York under the doctrine of *respondeat superior*.  Plaintiff

seeks compensatory and punitive damages, costs, disbursements, and attorney's fees

pursuant to applicable state, municipal, and federal civil rights law.

## JURISDICTION

2.  This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 and

1

the Fourteenth Amendment to the United States Constitution.  Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343 (a)(3) and (a)(4), this being an action seeking redress for the violation of Plaintiff's constitutional and civil rights.

3.   Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all non-federal claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy which gives rise to the federally based claims and causes of action.

### VENUE

4.   Venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) because the acts complained of occurred in this district.

### JURY DEMAND

5.   Plaintiff respectfully demands a trial by jury on each and every one of her claims as pled herein, pursuant to Fed. R. Civ. P. 38(b).

### PARTIES

6.    The individually named defendants are and were at all times relevant herein officers, employees and agents of the New York City Police Department ("NYPD").

7.    On the date of the incident giving rise to this complaint, the individual defendants were assigned to the NYPD 83rd Precinct in Brooklyn.

8.    Each individual defendant is sued in his individual and official capacity.  At all times mentioned herein, each individual defendant acted under the color of state law, in the capacity of an officer, employee, and agent of defendant City of New York ("Defendant City").

2

9.      Defendant City is a municipality created and authorized under the laws of New York State.  It is authorized by law to maintain, direct, and to supervise the NYPD, which acts as its law enforcement agent and for which it is ultimately responsible.

## STATEMENT OF FACTS

**THE MAY 9, 2024 INCIDENT**

10.     On May 9, 2024, Mother's Day, around 5 pm, Plaintiff and her mother Juanita Vidal were walking together in their neighborhood in Brooklyn, specifically Bushwick, near Irving Square Park.

11.     As they walked southeast along Knickerbocker Avenue, and began to cross Eldert Street, a car driven by Robert Matthews ("Matthews") – pursued closely at a high rate of speed by a marked NYPD car – struck Plaintiff and her mother in the crosswalk.

12.     Plaintiff's mother died at the scene, and Plaintiff was transported to the hospital with critical injuries, including but not limited to multiple rib fractures, a collapsed lung, and permanent injuries to her shoulder, back, and neck.

13.     Approximately ten minutes before that, officers from the NYPD 83rd Precinct – upon information and belief, Officers Kurlon Parris, Raghib Shaumik, and Christian Gutierrez – pulled over Matthews for not stopping at a stop sign, at Evergreen Avenue and Weirfield Street in Bushwick.

14.     During the traffic stop, Matthews sped away in his blue Mazda Cx-5 with Massachusetts license plates.

15.     The police officers had ascertained his license plate number prior to his driving away.

16.    The officers pursued Matthews, far exceeding the speed limit in doing so, as well as running stop signs and red lights to keep up with Matthews.

17.    The high-speed pursuit took place through at least eight blocks filled with parked cars, rush-hour traffic, pedestrians, cyclists, delis, daycare centers, storefronts, apartment buildings, parks, schools, and churches, among other forms of bustling city life.

18.    The pursuit ended when Matthews crashed into a parked van immediately after striking Plaintiff and her mother.

19.    Throughout the pursuit, Matthews sped, crossed double yellow lines, swerved around other drivers, ran red lights and numerous stop signs.

20.    The pursuit began at Weirfield Street and Evergreen Avenue, with Matthews speeding northeast along four long residential blocks of Weirfield Street (including Irving Park, which was full of families and children) and running at least three stop signs in the process.

21.    When Matthews reached Irving Street, he turned right then drove one block before turning right again onto Halsey Street, running a red light in the process.

22.    Matthews then sped southwest along Halsey Street for two blocks, running another red light in the process and speeding along the other side of Irving Park.

23.    When Matthews reached Wilson Avenue, he took a left, sped down the block, then took another left on Eldert Street, running a stop sign in doing so.

24.    Matthews proceeded to speed northeast along Eldert Street.

25.    The NYPD officers continued their high-speed pursuit through this residential street, trailing Matthews by just a few seconds.

26.    When Matthews reached the end of the block – where Eldert Street intersected with Knickerbocker Avenue – he ran the stop sign, sped through a crosswalk, bike lane, and a lane of car traffic, swerved away from a car in that lane, then struck Plaintiff and her mother as they were walking on the crosswalk.

27.    At no point during the chase did the pursuing NYPD officers activate their car's sirens to alert the public.

28.    At no point before, or as, Matthews sped through the intersection of Eldert Street and Knickerbocker Avenue, did the pursuing police officers alert, in any form, members of the public to be careful.

29.    Yolanda White, a neighborhood resident who heard the sound of the collision and saw Plaintiff and her mother in the immediate aftermath, told NY1 reporters that she did not hear any sirens; "maybe if they had that on, people would have been aware," she said.

30.    While Matthews fled the scene, he was ultimately apprehended (Arrest K24642638) and prosecuted by the Kings County DA's Office for manslaughter under Indictment No. 74138-24/001.

31.    On April 13, 2026, Matthews pleaded guilty in New York Supreme Court, Kings County, to second degree manslaughter and leaving the scene of an incident resulting in death.

32.    On May 29, 2026, Matthews was sentenced by Supreme Court Justice Adam Perlmutter to an indefinite prison term of 5 to 10 years.

33. Justice Perlmutter rejected the prosecution's recommendation of maximum punishment because, as he stated on the record, the officers pursuing Matthews' vehicle bore significant responsibility for the collision that caused the death of Plaintiff's mother.

**POLICE PURSUITS ARE NOTORIOUSLY DEADLY**

34. By May 2024, the dangers posed by police vehicle pursuits were well known to law enforcement agencies, policymakers, and the public. A comprehensive investigation published by the *Times Union* on May 28, 2024, reported that more than 100 people had been killed in New York in crashes following police pursuits since 2012, including drivers, passengers, and innocent bystanders. The investigation further found that most of these pursuits originated from traffic infractions or other minor offenses, and that approximately one-third of those killed were innocent bystanders.

35. Citing a national investigation by the *San Francisco Chronicle*, the *Times Union* report further noted that at least 3,336 people were killed in police pursuit-related crashes nationwide between 2017 and 2022.

36. The dangers posed by NYPD vehicle pursuits were particularly well known within New York City itself. Long before May 9, 2024, NYPD pursuits had repeatedly resulted in the deaths of drivers, passengers, pedestrians, cyclists, and other innocent bystanders throughout the five boroughs, and those incidents received substantial public attention.

37. As reported in the *Times Union*'s May 28, 2024 investigation, fatal pursuit-related crashes in New York City included, among others: the June 3, 2013 death of four-year-old Ariel Russo in Manhattan after a fleeing vehicle struck and killed her during an NYPD pursuit; the July 7, 2016 death of Roxina Clayton in Queens after a

fleeing suspect crashed into her vehicle during a police chase; the September 11, 2021 death of three-month-old Apolline Mong-Guillemis in Brooklyn after a vehicle fleeing a traffic stop struck her stroller; the March 13, 2023 death of David Brian Ellis in Brooklyn after a fleeing vehicle struck another automobile; the June 29, 2023 death of pedestrian Muj Gjocaj in the Bronx; and the April 16, 2024 death of Cesar Alfonso following an NYPD pursuit in the Bronx.

38.     These and numerous other publicly reported fatalities occurring over more than a decade prior to the May 9, 2024 incident placed the City on notice that vehicular pursuits—particularly those initiated over traffic infractions and other comparatively minor offenses—posed a recurring, foreseeable, and frequently deadly risk to innocent members of the public.

39.     The NYPD itself ultimately acknowledged the extraordinary dangers posed by vehicular pursuits, particularly those arising from low-level offenses and traffic infractions.  On January 15, 2025, Police Commissioner Jessica Tisch announced sweeping revisions to the NYPD's vehicle pursuit policy, explaining that "[t]he NYPD's enforcement efforts must never put the public or the police at undue risk, and pursuits for violations and low-level crimes can be both potentially dangerous and unnecessary."

40.     In announcing these reforms, the NYPD disclosed that NYPD officers initiated 2,278 vehicle pursuits during 2024, approximately 25 percent of which resulted in collisions, property damage, physical injury, or death, and that approximately 67 percent of those pursuits originated from fled vehicle stops—many of which would no longer be authorized under the revised policy.

**NYPD POLICIES AND PRACTICES UNDER MAYOR ADAMS**

7

41.     Beginning in or about 2022, the City of New York, acting through senior NYPD policymakers, adopted and implemented an increasingly aggressive vehicle pursuit strategy that encouraged officers to pursue fleeing motorists in circumstances that materially increased the risk to innocent members of the public.

42.     At a July 2023 press conference, Chief of Patrol John Chell publicly declared in response to reports documenting the dramatic increase in vehicle pursuits, "People thinking they can take off on us, those days are over."

43.     At the same time, the Department's own leadership recognized that "a vehicle pursuit must be terminated whenever the risks to the members of the service and the public outweigh the danger to the community if the suspect is not immediately apprehended," thereby acknowledging the governing safety principle while simultaneously presiding over a substantial increase in pursuit activity.

44.     Consistent with this aggressive enforcement philosophy, NYPD officers engaged in a dramatic and sustained increase in vehicle pursuits throughout New York City.

45.     Publicly available 911 call data demonstrate that monthly police pursuits increased from fewer than twenty-five in January 2022 to more than one hundred twenty-five in January 2023, and to more than two hundred twenty-five in January 2024.

46.     Similarly, NYPD data reflected that officers initiated 1,523 vehicle pursuits during the first nine months of 2024, representing a forty-seven percent increase over the same period the previous year.

47.     Public reporting further concluded that pursuit-related crashes increased sharply during this same period, with unprecedented numbers of collisions occurring after police pursuits.

48.     During the first eleven months of 2024 alone, police pursuits reportedly preceded 398 vehicle crashes, resulting in injuries to more than 315 individuals.

49.     Nearly one in four pursuits resulted in a collision, and pursuit-related crashes reached record levels during 2024, including fifty-three such crashes in June 2024 alone—a figure exceeding the monthly totals recorded during any year from 2017 through 2021.

50.     Publicly available data further showed that, during the first three years of the Adams administration, vehicle pursuits resulted in 799 crashes, exceeding the total number of pursuit-related crashes occurring during the preceding seven and one-half years combined.

51.     These statistics reinforced what prior fatalities and public reporting had already demonstrated – that the City's pursuit practices posed an increasingly grave and foreseeable danger to innocent members of the public.

52.     Consistent with the City's longstanding pattern of tolerating dangerous vehicle pursuit practices, the NYPD failed to take meaningful corrective action following the pursuit that killed Juanita Vidal and severely injured Plaintiff Jessica Vidal.

53.     Upon information and belief, none of the officers who initiated, participated in, supervised, or authorized the pursuit were disciplined, retrained, or otherwise subjected to meaningful remedial action as a consequence of the incident.

54.    The absence of corrective action following a pursuit that resulted in the death of an innocent pedestrian and serious injury to another further reinforced the Department's longstanding practice of tolerating dangerous pursuit conduct notwithstanding its known and foreseeable risks to the public.

55.    Although the NYPD maintained written pursuit policies recognizing that pursuits should be terminated when public safety outweighed the need for immediate apprehension, the City's actual customs, practices, supervision, and institutional response encouraged or tolerated increasingly aggressive pursuits, failed to ensure compliance with those policies despite repeated notice of deadly consequences, and failed to impose meaningful corrective action after catastrophic pursuit-related incidents.

56.    Upon information and belief, supervisory personnel responsible for monitoring vehicle pursuits failed to terminate pursuits that presented unreasonable risks to innocent members of the public, despite departmental policies recognizing that such pursuits should cease when public safety outweighed the need for immediate apprehension.

57.    The City's subsequent overhaul of its vehicle pursuit policy further underscores the seriousness of the risks that had long confronted the Department.

58.    On February 1, 2025, sweeping revisions to the NYPD's vehicle pursuit policy went in effect; these reforms expressly prohibited officers from initiating pursuits for traffic infractions, violations, and nonviolent misdemeanors.

59.    Police Commissioner Jessica Tisch explained that "[t]he advanced tools of modern-day policing make it possible to apprehend criminals more safely and effectively than ever before, making many pursuits unnecessary."

10

60.     The revised policy also required expanded supervisory oversight, mandatory department-wide training, monthly compliance reviews, and annual reporting regarding pursuit practices.

61.     The NYPD adopted these reforms because it determined that existing institutional safeguards governing vehicle pursuits were inadequate, and that meaningful oversight, training, accountability, and data collection were necessary to reduce the risks posed by vehicle pursuits and to better protect members of the public.

**DELIBERATE ACTS UNDER COLOR OF STATE LAW**

62.     All of the aforementioned acts of the individual defendants, their agents, servants and employees, were carried out under the color of state law in the course and scope of their duties.

63.     All of the aforementioned acts deprived Plaintiff of the rights guaranteed to citizens of the United States by the Fourteenth Amendment of the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

64.     The individual defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiff of her constitutional rights secured by 42 U.S.C. § 1983, and by the Fourteenth Amendment of the United States Constitution.

**DAMAGES**

65.     As a direct and proximate cause of the said acts of the Defendants, Plaintiff suffered the following injuries and damages:

a.  Violation of her constitutional rights under the Fourteenth Amendment to the United States Constitution;

b.  Severe and permanent physical injury and physical distress;

c.  Severe and permanent emotional trauma, distress, degradation, and suffering.

## SECTION 1983 CLAIMS

## FIRST CLAIM

### Substantive Due Process Under Section 1983

66.  Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

67.  By the actions deprived above, the individual defendants deprived Plaintiff of her Fourteenth Amendment right to substantive due process under the state-created danger doctrine.

68.  Here the defendant officers affirmatively created significant and foreseeable risk of harm to Plaintiff by recklessly chasing a dangerously fleeing vehicle through a residential neighborhood in Brooklyn, and the officers ultimately caused such harm.

69.  As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged.

## SECOND CLAIM

### Failure to Intervene Under Section 1983

70.  Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

71. Each and every individual defendant – including the passengers of the pursuing NYPD car – had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of her constitutional rights by other law enforcement officers.

72. The individual defendants failed to intervene to prevent or end the violations of her constitutional rights despite knowing about such violations and having had a realistic opportunity to do so.

73. As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged.

## THIRD CLAIM

### Municipal Liability Under Section 1983

74. Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

75. By the actions described, the Defendant City deprived Plaintiff of her Constitutional rights through a policy and practice of conducting dangerous NYPD vehicle pursuits for traffic infractions, and through its deliberate indifference in failing to train officers in such situations.

76. As a direct and proximate result of the acts of Defendant City, Plaintiff sustained the damages and injuries hereinbefore alleged.

## PENDENT MUNICIPAL CLAIMS

### FIRST CLAIM

**Right of Security Against Unreasonable Search and Seizure and Excessive Force Under New York City Administrative Code**

13

77.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

78.     As detailed above, the individual defendants intentionally violated Plaintiff's right to be secure against unreasonable searches and seizures, and against excessive force, in violation of New York City Administrative Code Title 8, Chapter 8:  The Right of Security Against Unreasonable Search and Seizure and Against Excessive Force Regardless of Whether Such Force Is Used In Connection with a Search or Seizure.  § 8-803 Civil action for deprivation of rights.

79.     As a direct and proximate result, Plaintiff sustained the damages and injuries hereinbefore alleged.

## SECOND CLAIM

### *Respondeat Superior*

80.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

81.     Defendant City is the employer of the individual defendants.

82.     Under the doctrine of *respondeat superior*, the Defendant City is responsible for the wrongdoing of its employees acting within the scope of their employment.

83.     As a direct and proximate result of the acts of the individual defendants detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands the following relief jointly and severally against the Defendants:

a.  An order awarding compensatory damages for Plaintiff Jessica

Vidal in an amount to be determined at trial;

b.  An order awarding punitive damages in an amount to be

determined at trial;

c.  A court order, pursuant to 42 U.S.C. § 1988, that Plaintiff is

entitled to reasonable attorney's fees, costs and disbursements; and

d.  Such other and further relief as this Court may deem appropriate.


DATED:      August 3, 2026
            New York, New York

_____
CYRUS JOUBIN, ESQ.
43 West 43rd Street, Suite 119
New York, NY 10036
(347) 349-0724
joubinlaw@gmail.com
Attorney for Jessica Vidal